Marshall, Ch. J.,
 

 after stating the facts relating to the several claims in this case, delivered the following opinion of the court, as to the claims of McKean & Woodland, Kimmel & Albert, and John H. Browning & Co.
 

 1. As to the claim of McKean & Woodland. The question of property, in this case, depends on certain letters written by Baily, Eaton & Brown, which were found on board the captured vessel. A letter of the 11th of July 1812, addressed to Samuel McKean, shows in the clearest manner, that the property in dispute was purchased and shipped for McKean
 
 &
 
 Woodland, in pursuance of their orders; and accounts for assigning it to Mr. Holladay.
 

 There is nothing in the cause which can throw the slightest suspicion on the fairness of this transaction. It, unquestionably, is, what, on the face of these letters, it purports to be, a purchase for McKean
 
 &
 
 Woodland, made in pursuance of their orders, and shipped for them to Robert Holladay, because, in the moment of shipment, information was received that their partnership was dissolved, and the shipper had no instructions in what manner to direct to them. In this situation, he considered himself as acting most certainly for their advantage, by addressing the goods to an agent residing in the same town with.McKean
 
 &
 
 Woodland, who should receive them to their use. In such a case, the court is of opinion, that the property was vested in McKean
 
 &
 
 Woodland, and is, consequently, not liable to condemnation as enemy property. The sentence is affirmed.
 

 *2. As to the claim of Kimmel
 
 &
 
 Albert. From their letter, it is apparent, that, in the event of war, Baily, Eaton
 
 &
 
 Baily reserved to ^ themselves that power which ownership gives over goods, and instructed their agent, McKean, in what manner that power was to be exercised. There being no letter addressed to Kimmel & Albert, but under cover to McKean, it is apparent, that they were to know nothing of the shipment, unless, in the opinion of McKean, it should be prudent to make the communication ; and even then, the property was to became theirs, not under the original contract, but under a new contract to be made with McKean. The delivery on board the ship, was a delivery to McKean, not absolutely for Kimmel & Albert, but for them, provided they acceded to new and distinct propositions made by Baily, Eaton & Baily. In such a case, no change of property could take place until Kimmel
 
 &
 
 Albert should accede to these new propositions ; and the capture having taken place before the contract was complete, the goods must be considered as enemy property. The sentence is reversed, and the claim dismissed.
 

 3. The claim of John H. Browning & Co. This claim stands on precisely the same principles with that of Kimmel & Albert. The documentary evidence is in effect the same, and was inclosed in the same letter from Baily, Eaton
 
 &
 
 Baily to Samuel McKean. The claim, therefore, must be dis missed. The sentence is reversed, and the claim dismissed.
 

 
 *209
 
 Johnson, J.,
 

 delivered tbe opinion of the majority of the court, as to the claim of W. & J. Wilkins, as follows : — Tbe points of distinction between this case and that of McKean & Woodland, unfavorable to these claimants, are the following : 1. That Harris, the direct consignee, had a control given him over the goods, which authorized him, had *he thought proper, to -■ refuse to deliver them over to the Wilkins’s. 2. That Harris had also a power, under certain circumstances, to make them his own. 3. That, in the letters both to the Wilkins’s and Harris, the consignor alleges as his reason for making the shipment through Harris, his fears that this government would not protect British property ; thereby, as is contended, acknowledging this property to be British. On the other hand, it is a circumstance favorable to this claim, that the original bills of parcels were made directly to the claimants, and were sent along with the shipment, as a substitute for an invoice.
 

 It is assumed as a postulate, that a direct consignment on account of the consignee, made in pursuance of his orders, is not subject to condemnation as prize of war ; and that it is immaterial, whether it be purchased for cash or credit; or insured in the enemy’s country or elsewhere. It will, then, be enough to show, that every beneficial interest which such a shipment would vest in the consignee, was vested in the claimants in this case.
 

 The first difficulty arises from the circumstance that the bill of lading was made out to Harris, and not to the Wilkins’s, whereby the master of the ship became bound to deliver them to Harris, or his assigns. Upon a fair view of the whole transaction, this distinction will be found rather to be formal than real; and that it produces no difference in the state of right between these parties. The interest vested in the consignee, by the delivery to the master, is not absolute to all ¡purposes. So far as relates to the right of stoppage
 
 in transitu,
 
 it continues subject to the control of the consignor, and may be reduced by him into possession, before actual deliv*330] the authority of the master to deliver them ’^according to the original bills of lading, may be countermanded, and another destination given them.
 

 Upon comparing all the circumstances of this case, it will be found, that the transaction was so arranged as to produce no other change in the rights of the parties, than to put it in Harris’s power to exercise this right of stoppage
 
 in transitu,
 
 in case of the insolvency of the Wilkins’s. The bill of lading is made out to Harris, which gave him the right to demand the goods of the master. But the invoice, which has the additional strength of a bill of parcels, is made out to the claimants, which gave them the right to demand the goods of Harris. Both in the letter to Harris and to the Wilkins’s, the shipment is declared to be on account of the latter; and in the letter to the former, the shipper goes into a detail of his reasons for giving the claimants so large a credit. Thus, these papers, taken togethei-, place the interest of these claimants on the same footing as if a bill of lading had been made out to Harris, for the use of the Wilkins’s; and in that case, there could have been little doubt that the claim must be sustained.
 

 If the invoice, although made out to the claimants, had been inclosed to the direct consignee, it would have furnished a strong argument in favor of the captor. But here, the evidence of right is placed in the claimants’ own hands; thereby acknowledging their right in the goods shipped, and furnish
 
 *210
 
 ing them with the means of asserting it. Thus, the shipper could never have denied the rights of the claimants in this case ; for he had furnished the most direct and conclusive evidence against himself.
 

 But it is asserted, that Harris had it in his power to make these goods his own, in defiance of the will of the claimants. If this were the fact, it would only show that, in ^either view of the alternative, it was a r*33j, shipment on American account, and that the shipper had parted with all his interest. But the fact is not so : and in answering this argument, we answer the remaining one also. The shipper knew what he was about. War was already probably declared, and he was aware of the crash of mercantile credit which generally follows on such an event. He also knew, that in case of asserting his right of stoppage
 
 in
 
 transitu, the property reverted and became British ; in which case, as he expresses himself, the property might be subjected to seizure, as enemy’s property. With these considerations on his mind, he makes out the bill of lading to Harris, and informs him that his object is to enable him to keep the goods back, in case' of an alteration in the circumstances of the claimants : and in this case only, is the hint given him that he may claim them as his own.
 

 It is contended, that he acknowledges, in his letter to the claimants, that the property is British. But this is an error in fact. It was necessary to assign some reason, or some excuse, for not having the bills of lading made out to the claimants themselves. And for this reason, he urges an apprehension that our government would not protect British property. But this reason could only be applicable in the event of a stoppage
 
 in transitu;
 
 as a direct shipment to the claimants would have left no room for such an apprehension. In the letter also to Harris, it is said, is contained an acknowledgment that the property is British. This, also, is founded in mistake ; for the letter to Harris only communicates the reason which had been assigned in the other letter for having the bill of lading made out as it was. But suppose, the passage in the letter to the claimants, on this subject, had been full and explicit to the declaration of an opinion that the property continued British, although shipped on American account ; yet this would have been but an expression of an erroneous opinion, and certainly ought not, so far as the interests of the claimants are concerned, to have an influence on the decision of this court.
 

 But it is asserted, that the goods continued, on the whole voyage, at the risk of *the shippers. This may be true, and yet it does not prove enough. Had the shipment been direct to the claimants, and insur- *- anee omitted, contrary to order or custom, the shippers would have been equally liable, and yet the property would not have been subject to capture. It is enough for the purposes of the claimants, that the property in the goods had been transferred to them, independently of the control of the shipper or his agent, except so far as the right to stop
 
 in transitu
 
 interfered. And such was the situation of the rights of the parties in this case. The goods ordered by the claimants were shipped to an agent, for their use, subject only to a right which unqestionably, under any circumstances, existed in the shippers. In their letter to the claimants, they inclose a bill of parcels, by way of invoice, containing a positive acknowledgement of the sale to them ; and the letter itself, as well as that to Harris, speaks of the goods expressly as their goods. The immediate consignee could, therefore, only
 
 *211
 
 be considered as the bailee of the claimants. Nor does it appear, that a tender of the money would have been necessary to entitle them to receive the goods of Harris, as, in the letter to Harris, it is acknowledged to be a sale on credit, and particular discounts offered as an inducement for an early payment. Indeed, there are words in the letter to the direct consignee, which amount to a positive declaration that the shipments were not on his account, nor on that of the shippers, but for the use and benefit of others. “ I shall send you, and our friends, through your hands, all the goods prepared for your market.” By connecting these words with the bills of lading, the result is, that, although the direct consignee was entitled to demand the goods of the master, yet it was not to his own use, but to the use of the several persons on whose account they were shipped.
 

 Decree affirmed.
 

 Story, J.,
 

 delivered the following separate opinion, as to the claim of W. & J. Wilkins — I cannot concur in the opinion of the court, just delivered, as to the claim of the Messrs. Wilkins. It is true, that the goods were purchased pursuant to the orders of Messrs. Wilkins ; but I do not think , that the ^property, by the mere purchase, became vested in them ; J and the usage and course of trade is generally otherwise. The ¡purchase was made with the money of the shipper : and until a delivery, actual or constructive, to the Messrs. Wilkins, the propriety thereof, remained completely in the shipper. The goods were also shipped as the property of the shipper, consigned to the agent of the shipper, and not to the agent of .the Messrs. Wilkins, to be delivered only in case of the consignee’s being satisfied of their perfect solvency. It is true, that the bill of lading purports that the goods are shipped on account and risk of the consignee ; but the confidential letters explain the transaction, and show that the shipment was so made, as a cover against belligerent risks ; and that the property was not intended to be changed from the British shipper, in its transit. The delivery, then, of the goods on board of a general ship, was no delivery to the Messrs. Wilkins : it was not even a delivery which vested the property of the goods in the consignee. The legal property and possession thereof still remained in the shippers ; and if the goods had actually come to the hands of Mr. Harris, his possession would have been but a continuation of the possession of the shipper. In contemplation of law, the goods were as much under the control and possession of the shipper, as if he had been on board the vessel, during the voyage, or had shipped them in his own name. If they had been lost, during the voyage, the loss would have been his. He had not a mere right of stoppage
 
 in transitu
 
 in case of insolvency, for that can be exercised only where the property by the shipment is vested in the consignee for his own use; but he had a perfect right of countermand in all cases whatever. He might sell the property, give it a new direction, control its delivery, and, indeed, exercise all the rights of full dominion and propriety. It seems to me, that if the Messrs. Wilkins had neither a
 
 jus ad rem,
 
 nor a
 
 jus in re,
 
 and the latter only is recognised in prize courts, they could not, by subsequent acts, overreach the legal rights of the captors. At the time of the shipment and capture, it was, in my view, enemy property, liable to condemnation, having no neutral or American
 
 onus-
 
 attached to it, It was subject to the legal claims of the creditors of the shipper ; and noth
 
 *212
 
 ing existed in the Messrs. Wilkins but a mere
 
 spes occupandi,
 
 or, as the common law phrases it, a mere possibility, which attached *neither to . the substance nor the form of the thing.
 

 There is a case cited by the court in
 
 The Aurora,
 
 4 Rob. 218, where property was shipped, by a merchant in Holland, to A., a person in America, by order of B., and per account of B., but with directions to A. not to deliver it, unless satisfaction should be given for the payment; and it was held as good prize, on the ground, that the property still remained-in the enemy shipper. This case I think strongly in point; and the manner in which Lawrence attempted to distinguish it from the case then on trial, shows a full concurrence in its correctness. The reasoning of the court in
 
 The Aurora
 
 itself, and in
 
 The Marianna,
 
 6 Rob. 22, are also illustrative of the general doctrine.
 

 On the whole, I consider that, by the doctrine of the common and the prize law, these goods were, at the time of capture, enemy property ; and that the claim of the Messrs. Wilkins, ought to be rejected ; and in this opinion, I have the concurrence of two of my brethren,
 
 (a)
 

 Upon what ground, then, if I am right as to the ownership of the goods, can the claim be maintained ? The right of capture acts upon the proprietary interest of the thing captured, at the time of capture. It is not affected by the secret liens, or private engagments of the parties. It repudiates oven the strong claim of a bottomry-bond, because it is not a
 
 jus in re.
 
 Can, then, a mere possibility be of more consideration in a court of prize ? The absence of all authority to this effect, and the strong and emphatic language of all the cases as to secret liens, speak as powerfully as the most direct and pointed decisions against it.
 

 Monday, March 14th.
 
 Harper
 
 suggested diminution of the record in the case of W.
 
 & J.
 
 Wilkins, and prayed the court to grant a writ of certiorari to the court below; but the court refused, the case having been argued and decided.
 

 (a)
 

 Judges Washington and Todd.